IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

FREDERICK A. PUENT,

                        Plaintiff,                          OPINION AND ORDER

    v.
                                                            13-cv-052-wmc

CROELL REDI-MIX, INC.,

                        Defendant.

---

      Plaintiff Frederick A. Puent proceeding *pro se* asserts claims under the American

Disability Act, 42 U.S.C. § 12112(a), Age Discrimination in Employment Act, 29 U.S.C.

§ 623, and a retaliation claim based on his complaints of age discrimination against his

former employer defendant Croell Red-Mix, Inc.  Before the court is defendant's motion

for summary judgment.  (Dkt. #17.)  For the reasons that follow, the court will grant

defendant's motion, direct the clerk's office to enter judgment in its favor, and close this

case.[1]


PRELIMINARY MATTER

      Plaintiff seeks an order barring defendant's use of plaintiff's deposition testimony.

(Dkt. #30.)  As best as the court can discern, Puent objects to defendant's use because he

---

[1] The court's decision granting summary judgment to defendant moots plaintiff's pending discovery-related motions.  (Dkt. ##30, 34.)  The court, however, has considered whether the discovery Puent sought -- most notably, company records concerning maintenance of his truck -- could have conceivably altered the outcome of this opinion and has determined that it would not. As explained more fully above, company records of truck maintenance and other records may aid Puent's effort to call into question Croell's purported reason for terminating his employment, but in light of the undisputed record, this evidence would not further his claim that he was terminated for a discriminatory reason.

did not have an attorney present at the deposition and had no knowledge of what was involved in taking a deposition. Puent also states that some of the questions were "one sided, and or not understood correctly." (*Id.* at 2.) While the court certainly appreciates that there are significant challenges in proceeding *pro se*, not least of which is dealing with opposing counsel, the court finds no basis to strike Puent's deposition testimony. Indeed, answering questions under oath with a court reporter present to record the proceedings verbatim is perhaps one of the "safest environments" for a *pro se* litigant since his only obligation is to answer truthfully the questions posed, and the court can strike answers given to unfair or improper questions.[2] Here, the court reviewed the portions of the transcript relied on by defendant in moving for summary judgment and found no concerns with the nature of the questions. While Puent may now regret certain of his answers after seeing how they impact the merits of his claims on summary judgment, this does not justify striking his testimony or otherwise limiting defendant's use of it. Indeed, many a represented party has experienced the same result since, as the saying goes, "facts are sticky things." Accordingly, the court will deny that motion.

---

[2] The court does not mean to minimize the intimidating nature of testifying under oath for any witness, especially without counsel present to object, assist or at least provide moral support, but rather to find that factor alone is not enough to justify striking plaintiff's testimony. Otherwise, a defendant, who after all did not start this lawsuit, would have no way to obtain admissible testimony from a plaintiff in advance of summary judgment or trial.

UNDISPUTED FACTS[3]

**A. The Parties**

Born in 1960, plaintiff Frederick A. Puent is a resident of Tomah, Wisconsin. Puent is also a former employee of defendant Croell Redi-Mix, Inc., a concrete producer of redi-mix concrete and paving asphalt from locations in six states, including Wisconsin. Puent's job responsibilities within Croell included driving a truck.[4]

For all times pertinent to Puent's claims, Dan VanVoorhees was the Tomah Plant Manager and Bill Wadephul was the Operations Manager. VanVoorhees is one year younger than Puent; Wadephul is nine years older than Puent. In March 2009, Wadephul hired Puent to work at Croell as a redi-mix truck driver in Tomah, Wisconsin. Puent reported to VanVoorhees, who in turn reported to Wadephul.

At some point, Puent was transferred to Mauston, Wisconsin. He wanted to continue to work there because he felt his supervisor in Mauston treated him well. Nonetheless, Puent contends that he was transferred to Mauston as "punishment." At some point, Wadephul decided to move Puent back to Tomah.

**B. Puent's Hand Injury**

In October 2000, Puent injured his right hand in a corn picking accident. Puent can work, dress and groom himself, cook, feed himself, write with a pen or pencil, use

---

[3] Unless otherwise noted, the court finds the following facts to be material and undisputed for purposes of summary judgment.

[4] Puent is currently employed full-time by Cardinal IG, where he custom builds bars for windows.

pots, pans and utensils.  He also has no lifting restrictions.  Moreover, he is physically able to perform the duties of the job he held at Croell.

Even so, Puent contends that his grip is somewhat impaired because he cannot use "small wrenches," and to use a maul, he needs a rag to keep his grip.  Puent last saw a doctor about his hand in 2011, though he sees a doctor on at least an annual basis for a heart condition and other problems.

Sometime in 2011, during his employment at Croell, Puent contends that part of his skin graft peeled because he did not have proper work gloves, although Puent did not file a workplace injury report or a claim for workers compensation related to this incident.  Puent also failed to obtain a doctor's note stating that he required any accommodation.  Puent further acknowledges that he had no limitations on his job as a driver for Croell.  Indeed, Medical Examination Reports for Commercial Driver Fitness Determination from March 2007 and March 2011 indicate that Puent had a hand condition, but that (1) it "doesn't affect ability to drive," and (2) he had "no limitation." (Def.'s PFOFs (dkt. #18) ¶ 20.)

Wadephul represents that he was unaware of Puent's hand condition, although Puent disputes this, asserting that Wadephul noticed Puent's right hand was damaged when he shook his hand to congratulate Puent on being hired.  Defendant also contends that Wadephul never said anything to Puent about his having a disability which Puent also disputes, asserting that Wadephul told him during his orientation day to "just be more careful of you[r] hand."   (Pl.'s Resp. to Def.'s PFOFs (dkt. #39) ¶ 22.) VanVoorhees also contends that he did not notice anything about the condition of

Puent's hand until Puent mentioned it.  More specifically, Puent never sought an accommodation, and VanVoorhees avers that he had no reason to believe that Puent's injured hand affected his ability to complete his work.  Puent, disputes this in part, asserting that VanVoorhees, too, noticed that his hand was damaged when he shook it at the time of Puent's hiring.

### C.  Puent's Allegations of Differential Treatment

In addition to his claims for failing to accommodate his hand injury, Puent claims to have been treated differently than other employees in a variety of ways.

### i.    Personal Protection Equipment

Puent contends that Croell failed to provide him proper personal protection equipment, such as gloves and a safety vest.  Puent acknowledges other employees wore gloves, but claims not to have known how they were obtained.[5]  Puent also represents that he purchased his own safety vest, but saw a supervisor give another employee a safety vest.

After trying unsuccessfully to find a suitable pair of gloves on his own, Puent used duct tape on his hands instead.  Croell maintains that gloves and safety glasses were available in the kitchen area of the Tomah facility, that each truck typically had a hard hat and safety vest in it, and that there were extra safety vests hung in the office.  Puent disputes that safety vests and gloves were available, but does not specifically address

---

[5] In other words, he has no evidence that the other employees received gloves from Croell.  On the other hand, Croell could easily have clarified this question and chose not to do so.

5

Croell's evidence to the contrary. In particular, he offers no evidence, however, that safety vests and gloves were made available to *other* employees. There is no dispute that Puent made demands about personal protection equipment to Wadephul and VanVoorhees, at times swearing at them in making such demands.

### ii.    Pay

Puent was originally paid at rate of $13.50 per hour.  Later, he received raises to $14.50 per hour, and then to $14.90.  Puent and another truck driver named "Potter" started at the same time and at the same rate of pay.  While defendants do not expressly acknowledge it, it appears other employees, including Potter, apparently received larger raises than Puent.  Croell contends, however, that the other employees did not have the same record of incident reports as Puent.[6]  Croell further maintains that unlike Puent, Potter volunteered to take on additional duties, such as mechanical and back-up dispatcher duties, which also contributed to his receiving a higher raise.  Puent counters that these additional duties were not offered to him because he was not allowed in the office.[7]

### iii.    Better Assignments

Typically, VanVoorhees assigned redi-mix drivers to their routes on a first in, first out basis, except when a *customer* requested a particular driver, in which case VanVoorhees would attempt to accommodate the request.  While Puent asserts that

---

[6] Although Puent purports to dispute even receiving any incident reports, the undisputed record demonstrates that Puent *did at least receive* a number of incident reports as detailed below.

[7] There appears no dispute that another driver, Mark Pitel, was compensated at a higher rate of pay because he worked approximately twelve years longer than Puent, having started in 1997.

there was another exception for younger drivers, like Dustin Potter, who were supposedly allowed to pick their cement loads, VanVoorhees specifically denies that any drivers were allowed to to "pick their jobs."   More importantly for summary judgment purposes, Puent's only evidence of an exception for younger drivers is his observation that Potter would arrive earlier and already have received an assignment by the time Puent arrived, which is, of course, entirely consistent with VanVoorhees' testimony that he assigned drivers on a first in, first out basis.

### iv.   Puent's Truck

Croell's Tomah site had four trucks.   Puent primarily used truck number 315. Defendant contends that Puent's truck was not significantly different from the other trucks available in Tomah, except that, over the period Puent drove it, he was particularly hard on it and caused more damage to it.  For example, Puent's truck was the same age as another truck used by a Tomah co-worker.  And while his truck could not drive over 50 miles per hour, neither could at least one other of the Tomah trucks.   Still, Puent contends that:  (1) the windows on his truck were scratched by acid used to clean cement dust off of it; and (2) his truck was plagued by transmission problems that pre-dated Puent's employment.[8]   However, Puent offers proof that this maintenance record was materially worse than any of the other three Tomah trucks, and he acknowledges that he

---

[8] As indicated earlier, Puent sought discovery on the maintenance records for his truck.  (Pl.'s Resp. to Def.'s PFOFs (dkt. #39) ¶ 41.) For the purposes of determining defendant's motion for summary judgment, the court assumes that his truck had problems that pre-dated Puent's use of it.

filled out a number of work orders regarding issue with his truck that were processed, resulting in the issues being fixed.

### v.   Hours

The work of a redi-mix truck driver at Croell is seasonal, meaning that there are busy and slow periods of work.  As the handbook provides, "[t]he normal hours of work that are observed in each location shall be established and announced by the manager who is in charge of each location. . . . Due to the nature of the business, hours may vary and the cooperation of all employees is earnestly requested and required in following the assigned hours."  (Def.'s PFOFs (dkt. #18) ¶ 27 (quoting Ackerson Decl., Ex. 12 (dkt. #20-12) 2.)  Puent contends, however, that he was not given hours "equally."  (Pl.'s Resp. to Def.'s PFOFs (dkt. #39) ¶ 27.)  Croell's records reflect that some weeks Puent worked more than his fellow Tomah redi-mix drivers and other weeks, he worked less. On average, over time, Puent worked more than some drivers and less than others. Sometimes Puent was required to work through lunch, as were other Tomah redi-mix drivers.

### vi.   Access to Office

Finally, while acknowledging that he was allowed to use the office to complete paperwork, Puent contends that he did not sit, but rather stood in the office.  Croell represents that this practice was consistent with its general policy that drivers not spend a lot of time in the office.  Puent's only response to that representation is that the "younger drivers" were allowed to stay in the office.

8

**D. Evidence of Discriminatory Intent**

Dating back to the beginning of his employment by Croell, Puent contends that VanVoorhees told him repeatedly, that he did not like to have "old people" working for him.  (Def.'s PFOFs (dkt. #18) ¶ 69 (quoting Puent Depo. (dkt. #23) 212).)  Puent further contends that VanVoorhees repeatedly called him a "cripple."  (*Id.* (quoting Puent Depo. (dkt. #23) 224).)  VanVoorhees denies making *either* of these purported statements.  Moreover, neither of these statements are mentioned in Puent's complaint, nor in his EEOC charge.

**E. Puent's Incident Reports**

Croell contends that Puent was involved in a variety of incidents that resulted in damage to the trucks he drove.  Puent disputes this, claiming that there was only one instance.  Given his subsequent responses, Puent also appears to contend that the other incident reports were not legitimate or justified, but does not deny -- nor could he legitimately deny -- that he was involved in each of these incidents and wrote up the reports.

On July 13, 2009, Puent was in an accident that resulted in damage to the rear bumper of a company truck.  While Puent's incident report stated that he was rear-ended by a truck while his truck was parked, Croell later received a police report that provides a conflicting account.  According to the police report, Puent backed into the other vehicle and was at fault.  The police report further indicated that Puent was cited for "inattentive driving."  Puent does not dispute the police report, nor that VanVoorhees believed this

report was true and gave Puent a verbal warning to be more careful while operating company equipment.

On November 2, 2009, Puent completed another incident report arising out of his attempts to pour redi-mix concrete into a hole to support a sign post.  After Puent noticed that the hole had water in it, he knew that the redi-mix would not set properly. Nonetheless, Puent proceeded to pour the cement, supposedly because of the customer's specific direction, though he did not include this detail in the incident report itself. VanVoorhees again gave Puent a verbal warning about this incident and encouraged him to improve his performance.

On August 10, 2010, Puent completed a third incident report when the hopper on his truck hit the bottom of a bridge, resulting in damage to the truck.  In the incident report, Puent stated that he was driving about 55-60 miles per hours (the speed limit was 55) "when the hopper bounced up and hit the bottom of the bridge," at which point "one of the pins on the hopper broke."  (Def.'s PFOFs (dkt. #18) ¶¶ 89-90.)  Now, however, Puent claims that another co-worker bypassed the safety on the hopper, leaving it up. VanVoorhees did not believe that a pin could have broken on the hopper, instead he believed that Puent left the hopper up.  Croell further offers proof that VanVoorhees conducted a crew discussion and again verbally counseled Puent.  Puent disputes this, claiming that he was working at the Mauston plant at the time of this incident, but again his incident report indicates that he did receive counseling on this.

On October 4, 2010, Puent completed a fourth incident report, in which he describes "pouring cement in the basement wall going forward and in reverse, and his

10

fender on the cement truck pushed the boiler off its foundation." (Def.'s PFOFs (dkt. #18) ¶ 94.) Puent does not dispute that he completed this incident report, but rather contends that he was "forced to" fill it out and that he didn't believe that he hit anything. (Pl.'s Resp. to Def.'s PFOFs (dkt. #39) ¶ 94.) Puent again received verbal counseling regarding this incident.

Finally, Puent completed a fifth incident report on June 8, 2011, after a rock from a county dump truck hit the windshield of his truck. Puent was not disciplined for this incident because it was an accident.

On June 14, 2011, Puent also called VanVoorhees to tell him that the transmission temperature on his Croell truck was over 300 degrees. Puent attributed the high heat to the fact that he was holding one foot on the gas and one foot on the break when pouring concrete. VanVoorhees told him not to do that because it would cause the transmission to overheat and would destroy it. Despite VanVoorhees's warning, Puent used the same flawed technique a week later. Again, VanVoorhees told him not to do this, but Puent ignored his direction. Puent contends that he made some changes to his technique, but appears to argue that the maneuver was necessary for the trucks to haul curb and gutter.

### F. Croell's Winter Lay-Offs and Puent's Termination

Croell typically lays off redi-mix truck drivers in Tomah for a period of time between November and April, when construction in rural Wisconsin generally grinds to a halt, although it sometimes recalls people for occasional, out-of-season jobs. Puent does

11

not appear to dispute this, other than to perhaps clarify that this is called a "Booked Hours Request." (Pl.'s Resp. to Def.'s PFOFs (dkt. #39) ¶ 102.)

In the winter season of 2012, Puent and other drivers were laid off. During this particular layoff period, however, Wadephul discovered that the brakes on the truck Puent typically drove were not in working order and the transmission was out. Croell maintains that Puent is responsible for routine maintenance of his ruck, and Wadephul believed that he had failed to maintain it properly. Wadephul also observed that Puent failed to note the condition of the brakes in his weekly maintenance reports. Puent contends, however, that he was only responsible for light routine maintenance *and* that there is no place on the weekly maintenance report to record the condition of breaks or transmission.

Wadephul also contends that he later spoke to Puent about the brakes and tag axels, asking him how long the brakes had been damaged, to which Puent replied, "since last summer." While Puent disputes having this conversation, Wadephul claims to have been very upset about both Puent's apparent disregard for the condition of the truck and its actual condition, which totaled more than $6000 to repair. Wadephul also believed that Puent had falsified reports to Croell and to the Department of Transportation. Not surprisingly, Puent disputes this as well, claiming that he had consistently complained to VanVoorhees about the transmission slipping.

After Wadephul had an opportunity to review Puent's personnel file and various incident reports, he believed that Puent's conduct indicated a lack of regard for the company, its property, safety and his job, and that Puent was not performing the duties

for which he had been hired.  As a result, Wadephul determined that Croell would terminate Puent's employment.  Puent does not dispute this, but contends that Wadephul also said that he would have to pay $4000 for truck repairs to keep his job.

In March 2012, Wadephul and VanVoorhees informed Puent that his employment was terminated because of the damage to his truck's transmission and brakes.  Wadephul was the decisionmaker.

In March 2012, Croell also hired three new redi-mix drivers in Tomah.  One of the new hired drivers was born in 1955, and therefore was five years older than Puent.  Another new driver was born in 1962, two years Puent's junior.  The third driver was quite a bit younger, born in 1982.  Puent purports to dispute the birthdates of the older two, but also points out that none of them worked a full season.

### G. EEOC Charge

On May 22, 2012, Puent filed a charge of age and disability discrimination with the EEOC which was cross-filed with the Wisconsin Equal Rights Division.  That charge does not allege retaliation.  Specifically, the charge form provides a box for "retaliation," but it is not checked.  Instead, Puent placed an "X" in the box for "disability" and "age" only.  (Def.'s PFOFs (dkt. #18) ¶ 116 (citing Puent Depo., Ex. 17 (dkt. #23-8)).)  The charge also does not include anything indicating that Puent had complained of discrimination on the basis of age or disability or otherwise engaged in any protected conduct.  The EEOC dismissed Puent's charge on December 28, 2012.  This case followed.

OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Factual disputes preclude summary judgment only if the "facts might affect the outcome of the suit under the governing law." *Id.* at 248.

The party moving for summary judgment bears the initial burden of showing there is no genuine issue of material fact and that it is entitled to relief. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once this initial burden is met on an issue for which a nonmoving party will bear the burden of proof at trial, that party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. The nonmoving party may not "simply show some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmoving party must produce "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If he fails to do so, "[t]he moving party is 'entitled to a judgment as a matter of law.'" *Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)). Here, Puent has offered insufficient proof to meet this threshold on any of his claims.

## I.  ADA Claim

Under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, as amended by the Americans with Disabilities Act Amendments of 2008 ("ADAAA"), "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees[.]"  42 U.S.C. § 12112(a).  To prevail on an ADA discrimination claim, Puent must show: "(1) he is disabled; (2) he is able to perform the essential functions of the job either with or without reasonable accommodation; and (3) he suffered an adverse employment action because of her disability." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 533 (7th Cir. 2013).

The ADAAA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities . . . ; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1).  Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

The 2008 amendments to the ADA changed the definition of "substantially limits" in at least two key respects: (1) a person with an impairment that substantially limits a major life activity, or a record of one, is disabled, even if the impairment is "transitory and minor" (defined as lasting six months or less); and (2) "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." *Gogos v. AMS Mech. Sys., Inc.*, 737 F.3d 1170, 1172-73 (7th Cir.

2013) (quoting 42 U.S.C. § 12102(4)(D); citing 42 U.S.C. § 12102(3)(B); 29 C.F.R. § 1630.2(j)(1)(ix)).

Even taking into consideration that "the definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter," 42 U.S.C. § 12101(4)(A), Puent fails to present *any* evidence permitting a reasonable jury to find that the 2000 injury to his hand constituted a disability during his employment at Croell.  To the contrary, Puent testified at his deposition that it did not limit any major life activity during this period.  While Puent represents in his summary judgment materials that he has difficulty in holding utensils due to a weak grip, he fails to connect this issue with any job-related limitation.  Accordingly, the court will enter judgment in defendant's favor on the ADA claim.


## II.   ADEA Claim

The ADEA makes it unlawful for an employer to discriminate against an individual "because of such individual's age." 29 U.S.C. § 623(a)(1).  Puent was 48 in March 2009, at the time he was hired by Croell, and 51 in January 2012, at the time his employment was terminated.  Thus, he qualifies for protection under the ADEA, which extends to individuals forty and over.  29 U.S.C. § 631(a).  If qualified, Puent "may avoid summary judgment by providing either direct or circumstantial evidence that would allow a reasonable juror to infer that her employer acted for discriminatory reasons." *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 880 (7th Cir. 2014).  In particular,

under the ADEA, Puent "must produce evidence from which a jury could infer that h[is] age 'was a but-for cause of [his] termination.'" *Id.* (quoting *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 603 (7th Cir. 2012); citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)).

Here, Puent points to two types of evidence to support his claim with respect to his termination.  First, during a three-month period in 2011, when the seat of his truck was broken and Puent was hobbling around, Puent contends that VanVoorhees stated on multiple occasions that he did not like "old people" working for him.  (Puent's Depo. (dkt. #23) 223.)  Second, Puent points to instances when he was treated differently than co-workers, at least one of which was younger than Puent.

As for the first type of evidence, derogatory remarks can certainly be direct evidence of discrimination, but must be (1) made by the decisionmaker, (2) near the time of the adverse decision, and (3) in relation to the adverse decision.  *Ellis v. United Parcel Serv., Inc.*, 523 F.3d 823, 829 (7th Cir. 2008); *see also Walker v. Glickman*, 241 F.3d 884, 888 (7th Cir. 2001) ("Remarks and other evidence that reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria will suffice as direct evidence of discrimination even if evidence stops short of a virtual admission of illegality.").  There is no dispute on this record that Wadephul terminated Puent's employment, and there is no evidence connecting VanVoorhees' alleged age bias to Wadephul's termination decision -- whether the direct evidence Puent offers of VanVoorhees' alleged statements or the circumstantial evidence of differential treatment. *See Larimer v. Dayton Hudson Corp.*, 137 F.3d 497, 500 (7th Cir. 1998) ("It is well

17

established that 'statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself,' are insufficient to satisfy a plaintiff's burden of proof in an employment discrimination case.") (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)).[9]   Puent's claim that Wadephul terminated his employment because of Puent's age is particularly suspect given that Wadephul himself is nine years older than Puent, hired Puent at the age of 48, and terminated his employment just three years later at the age of 51.   *See Roberts v. Separators, Inc.*, 172 F.3d 448, 452 (7th Cir. 2009) (explaining that this "common actor" fact creates a "strong inference" of nondiscrimination).

Indeed, in his opposition to summary judgment, Puent contends that he was terminated because of his complaint about how Croell, and VanVoorhees specifically, were treating so-called "banked time."  (Pl.'s Opp'n (dkt. #38) 16.)  Whether this is in fact the reason for his termination, Puent has failed to put forth sufficient evidence linking VanVoorhees' alleged bias against older people to *Wadephul's* decision to terminate his employment, or to otherwise allow a reasonable jury to infer that Puent's termination was because of his age.

Still, the question remains whether defendant violated the ADEA by VanVoorhees' differential treatment of Puent.   In addition to termination of

---

[9] While there are instances where a non-decisionmaker's discriminatory animus can implicate a decisionmaker under a "cat's paw" theory of discrimination, Puent failed to offer any evidence from which a jury could infer that VanVoorhees "use[d] the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment action."  *Smith v. Bray*, 681 F.3d 888, 897 (7th Cir. 2012) (internal citation and quotation marks omitted).

employment, a materially adverse action "might be indicated by . . . a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Crady v. Liberty Nat. Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993). Of the laundry list of complaints Puent provides, only differential pay and decreased hours could constitute a materially adverse action. Unfortunately for Puent, he failed to raise a genuine issue of material fact that he was treated differently than other employees with respect to those two categories. To the contrary, Puent (1) worked more than some employees and less than others, and (2) received hourly raises, albeit at perhaps smaller increments. Moreover, any difference in pay or hours is amply justified by the undisputed evidence in Puent's own incident reports and decreased responsibilities as compared to other employees. The other instances of differential treatment (even assuming Puent put forth sufficient evidence in support) are at most "a mere inconvenience or an alteration of job responsibilities" and do not constitute an adverse action. *See Crady*, 993 F.2d at 136.


### III. Retaliation Claim

Finally, defendant seeks summary judgment on Puent's retaliation claim. As a general rule, a plaintiff "cannot bring claims in a lawsuit that were not included in [his] EEOC charge." *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). "For a plaintiff to proceed on a claim not raised in an EEOC charge, 'there must be a reasonable relationship between the allegations in the charge and the claims in the complaint,' and it

must appear that 'the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations of the charge.'" *Jones v. Res-Care, Inc.*, 613 F.3d 665, 670 (7th Cir. 2010) (quoting *Vela v. Vill. of Sauk Vill.*, 218 F.3d 661, 664 (7th Cir. 2000)).

Here, Puent does not dispute failing to allege in his EEOC charge that Croell retaliated against him because of his complaints about age discrimination.  Not only did Puent fail to check the "retaliation" box -- an omission the court might have been willing to overlook in isolation -- Puent provided *no* statements indicating that retaliation was part of his complaint.

Moreover, even if Puent had exhausted this administrative remedy, he fails to put forth any evidence to support a causal link between Puent's alleged complaints about age discrimination and his termination.  To the contrary, as described above, Puent actually claims he was terminated because of his complaints about Croell's treatment of banked hours, which, if true, would defeat a retaliation claim under the ADEA in any event.

ORDER

IT IS ORDERED that:

1) Plaintiff Frederick Puent's notice/objection to deposition (dkt. #30) is DENIED.

2) Plaintiff's letter request for permission to obtain sworn affidavits and request for production of documents (dkt. ##34, 41) are DENIED as moot.

3) Defendant Croell Redi-Mix, Inc.'s motion for summary judgment (dkt. #17) is GRANTED.

20

4) Defendant's motion for court trial (dkt. #57), motions *in limine* (dkt. #61), and motion to dismiss for lack of prosecution (dkt. #68) are all DENIED as moot.

5) The clerk's office is directed to enter judgment in favor of defendant and close this case.

Entered this 1st day of February, 2016.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge